**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

FILED
IN CLERKS OFFICE

2023 AUG 25 PM 3: 38

U.S. DISTRICT COURT
DISTRICT OF MASS.

---

**JENIFER GOMES DeANDRADE,**

*Plaintiff*, **PRO SE**

**v.**

**LOUIS DeJOY, PMG US POSTAL SERVICE,**
**NATIONAL POSTAL MAIL HANDLERS UNION**
    **Local 301,**
**LAWRENCE W. CROSBY JR,**
**DUANE LARIVIERE,**
**MARTHA A. ST GERMAINE,**
**CONNIE M. MARVIN,**
**MICHAEL R. SALVON,**
**JOAN C. BATES,**
**ROBERT E. DRAGON JR,**
**MICHAEL A. BISONO,**
**JAMES R. O'BRIEN JR,**

    *Defendants*.

**Civil Action No.** _____

**COMPLAINT**

**JURY TRIAL DEMANDED**

---

I, Plaintiff Jenifer Gomes DeAndrade allege upon knowledge with respect to myself, and upon knowledge, information and belief as to all other matters, against the Defendants as follows:

## I.    NATURE OF THIS ACTION

1.  I, Plaintiff Jenifer Gomes DeAndrade ("DeAndrade") bring this action against the United States Postal Service ("USPS"), the National Postal Mail Handlers Union ("NPMHU"), Lawrence W. Crosby Jr ("Crosby"), Duane Lariviere ("Lariviere"), Martha A. St. Germaine ("St. Germaine"), Connie M. Marvin ("Marvin"), Michael R. Salvon ("Salvon"), Joan C. Bates ("Bates"), Robert E. Dragon Jr ("Dragon"), Michael A. Bisono ("Bisono"), and James R O'Brien Jr ("O'Brien") for gender, race and

color discrimination, hostile work environment and retaliation in violation of Title VII of the Civil Rights Act of 1964, 42 U.S. Code § 2000e *et seq*., the No Fear Act of 2002 5 U.S.C. 2301 *et seq*., the Privacy Act of 1974 5 U.S.C. § 552e, and for a misogynoir motivated conspiracy to deprive me of my constitutional right to due process and equal protection in violation of the Civil Rights Act of 1871 42 U.S.C. §§§ 1983, 1985, 1986. Other relevant laws or precedent include the 2016 Administrative Leave Act and the US Supreme Court decision in *Burlington Northern & Santa Fe (BNSF) Railway Co. v. Caucasian*, 548 U.S. 53 (2006).

2. The actions that have led to this complaint are specifically:

   a. being emergency suspended from working and being placed on Administrative leave for 991 days commencing on May 13th, 2020,

   b. being permanently stripped of my earned federal position upon return to duty on January 30th, 2023, and

   c. being deemed "unsuitable" for professional advancement opportunities ***indefinitely*** all without protection of my statutory and constitutional rights.


## II.    THE PARTIES

3. I, *Plaintiff* Jenifer Gomes DeAndrade (born Jenifer Santos Gomes) am a natural person residing at: 10 Fuller Avenue Unit 3 in Attleboro, Bristol County, Massachusetts.

4. *Defendant 1,* DeJoy is Postmaster General of the United States Postal Service as established by 39 U.S.C § 201, located at 475 L'Enfant Plaza SW in Washington, District of Columbia 20260.

5. *Defendant 2,* the NPMHU is recognized as the exclusive collective bargaining agent for Mail Handlers employed by the USPS. Local 301, is located out of 971 Worcester Street in Natick, Middlesex County, Massachusetts 01760.

6. *Defendant 3,* Crosby is an individual located at 25 Dorchester Avenue in Boston, Suffolk County, Massachusetts 02205. Crosby emergency suspended me as the former Providence Processing and Distribution Center ("P&DC") Executive Plant Manager. Since that time, Crosby has been promoted to being the Executive Plant Manager of the Boston General Mail Facility ("GMF").

7. *Defendant 4,* Lariviere is an individual with an unknown address of abode, that will have to be discovered, since he is now retired. Lariviere was the Executive Plant manager of the Boston GMF who was Crosby's higher level report when I was emergency suspended.

8. *Defendant 5,* Martha A. St. Germaine is an individual located at 24 Corliss Street in Providence, Rhode Island 02904. St. Germaine is currently the Providence P&DC Plant Manager. She is responsible for permanently reassigning me out of my job, and for permanently deeming me "unsuitable" for promotion.

9. *Defendant 6,* Connie M. Marvin is an individual located at 25 Dorchester Avenue in Boston, Suffolk County, Massachusetts 02205. Marvin was the Greater Boston District Manager of Labor Relations. She was promoted at some point to the District Human Resources Manager. Marvin is currently back to being the MA-RI District[1] manager of Labor Relations. Marvin has had oversight over my situation since I was emergency suspended.

---

[1] At some point recently due to organizational restructuring changes, the name of the district was changed from the Greater Boston District to the MA-RI District, which better reflects the territory covered by the District leadership. In or about April 2020, Rhode Island was moved from the old Connecticut Valley District to Greater Boston for reporting structure and oversight purposes.

10. *Defendant 7,* Michael R. Salvon is an individual located at 8 Griffin Road North in Windsor Connecticut 06006. Salvon is the USPS Attorney that has had oversight over my situation since I was emergency suspended. He has been the only Law Office Attorney assigned to my case(s) and has been the representative for the Agency throughout all of my recent EEO activity. Further, Salvon has overstepped his own jurisdiction in being involved in decision-making. His established role is to counsel and not actively participate in management's actions. I intend to show that Salvon has acted inappropriately in his role as counsel. Instead, he is co-conspirator.

11. *Defendant 8,* Joan C. Bates, is an individual located at 67 Summer St in North Adams, Berkshire County, Massachusetts 01247. Bates was an investigator and co-author of a flawed investigative report that the USPS continues to use in punishing me.

12. *Defendant 9,* Robert E. Dragon Jr is an individual located at 8 Pomeroy Meadow Rd in Southampton, Hampshire County, Massachusetts 01073. Dragon was an investigator and co-author of a flawed investigative report that the USPS continues to use in punishing me.

13. *Defendant 10,* Michael A. Bisono is an individual located at 24 Corliss Street in Providence, Rhode Island 02904. He is currently President of the NPMHU Local 301, Branch 18 and a Tour 3 (evening shift) Mail Handler who has conspired with racial and sexist animus with the other co-Defendants in emergency suspending me, taking my job away, and deeming me unsuitable for any further professional opportunities.

14. *Defendant 11,* James R. O'Brien Jr is an individual located at 24 Corliss Street in Providence, Rhode Island 02904. O'Brien is a union steward under the American Postal Workers Union ("APWU") who has conspired with racial and sexist animus with the other co-Defendants in emergency suspending me, taking my job away, and deeming me unsuitable for any further professional opportunities.

15. All individuals named above, including myself as the Plaintiff, are current or former employees of the USPS.

16. With the exception of Salvon, we all are (or were) part of the MA-RI District.

17. I, Plaintiff am a Black woman of African descent. All of the other individuals named above are Caucasian, except for Bisono who's identifying race and color is not known.

### III.    JURISDICTION AND VENUE

18. This Court has federal question and supplemental jurisdiction under 42 U.S.C. § 2000e pursuant to 28 U.S.C. §§ 1331, 1367 because the federal law claims arise under the Constitution and statutes of the United States.

19. This Court also has diversity jurisdiction under 28 U.S.C. §§ 1332 as I, and one or more Defendants are citizens of different states, and the amount in controversy exceeds $75,000.

20. Venue is proper as I, Plaintiff reside in Attleboro, Bristol County, Massachusetts.

### IV.    ADMINISTRATIVE PROCEDURES

21. On August 1, 2020 I, Plaintiff filed a formal complaint with the Equal Employment Opportunity Commission ("EEOC") claiming ongoing discrimination based on gender, race, color and reprisal for prior protected activity (Agency No. 1B-021-0024-20).

22. Having administratively exhausted the claims, on May 30th, 2023 the EEOC issued a letter advising me, Plaintiff of my RIGHT TO FILE CIVIL ACTION.

### V.    FACTUAL ALLEGATIONS

23. I, Plaintiff Jenifer Gomes DeAndrade have been an employee of the USPS for more than 22 years, having been hired on December 16th, 2000.

24. Through the decades, I have served dutifully in accordance with my oath to protect and advance the efficiency of the Service and to abide by all postal and federal rules and regulations pursuant to 5 U.S.C. § 7001.101. I have received several awards, commendations and promotions. And I have never been disciplined, reprimanded or put on any Performance Improvement Plan by any of the dozen or so bosses that I have worked for, prior to Crosby.

25. I have held numerous permanent management positions at USPS since 2002 to include Supervisor of Customer Services, Supervisor of Distribution Operations ("SDO"), Dispute Resolution Specialist, Labor Relations Specialist, Officer in Charge, Postmaster, and Manager of Distribution Operations ("MDO").

26. I am a graduate of Boston Latin School. I studied at Boston University and then Providence College where I obtained a Bachelor of Arts Degree in Leadership Development. With my degree, I was inducted to membership in Alpha Sigma Lambda, a national honor society.

27. In December 2018, I was an EAS Level 21 Northeast Area Labor Relations / Dispute Resolution Specialist, where I worked with National Association of Letter Carriers ("NALC") Union officials in the processing and adjudication of workplace grievances.

28. In December 2018, I was competitively selected for the Tour 1 (overnight) EAS Level 20 MDO position at the Providence RI P&DC by Crosby, based upon my prior years of experience working as an SDO and acting MDO in the facility. Crosby, was at that time, the Providence Plant Manager.

29. The selection and change in position and level (going from a level 21 to a level 20 job) was voluntary for me. I wanted to take the position as MDO as I observed it to be the fastest path to

advancement within the USPS. Many more MDOs are tapped to become high ranking executives, as they progress through the ranks, as compared to other positions. The MDO job can therefore be a very successful launching pad for someone's career. And, I desperately want to put my knowledge, skills and abilities to use in helping the USPS improve its condition. The only way to do that, I believe, is from a position with broad scope and responsibility. And to get there, the critical path starts from an MDO position.

30. Further, the overnight, Tour 1 position came with the opportunity to earn shift premiums which would supplement by basic salary by about $200/week.

31. In the MDO position, I became the only Black female Manager at the USPS in the entire state of Rhode Island. As far as I knew, I was only the second woman of color to *ever* become a manager in the state.

32. Throughout 2019, I performed my duties without major issues, although there were routine grievances from the unions in the facility, complaints and suggestion box comments, etc. asking Crosby, to remove me from my position.

33. A fraction of my 200 or so employees were mostly disgruntled over my efforts to increase efficiency. With me leading the overnight Tour 1 crew, overtime was down. Breaks and lunch schedules were in place. Employees were being moved to match the workload better. Employee truancy was being addressed along with other conduct issues. Scanning and visibility initiates were improving. Service scores were high.

34. When it came time to address my performance as an MDO at the end of Fiscal Year 2019, Crosby, indicated on October 8th, 2019 that he was pleased and that I should continue to drive "Service, Engagement and Efficiencies." The Christmas / holiday rush period in December 2019 was

successful for the Providence P&DC in large part due to my efforts leading the over 200 employees (that I had direct and in-direct reporting relationship) in the nightly mail processing and dispatch of over 200 trucks, that go out to local Post offices throughout all of RI and most of Southeastern MA, with all of their mail to deliver to our customers.

35. The USPS has lost more than $83 billion since 2006 according to the PEW Research Center[2].

36. By my estimates that deficit increases by about $20 million or so, EVERY SINGLE DAY. As someone who wants to see the beloved agency thrive, I see driving efficiencies and reducing costs to be what should be our top priority.

37. However, taking $20 million out of someone's pockets every day as an adaptive change leader is sure to make some enemies. I am confident that DeJoy, as CEO/PMG of USPS since 2020, would surely agree with this assertion. He has had to deal with a lot of the similar hatred, pushback and misperceptions, that I have. The difference is, that he has not been removed from his job. I have.

38. In January 2020, Bisono, won the local Mail Handler Union election and became Local 301 Branch 18 RI, replacing Mail Handler Joseph Stanlione.

39. Almost immediately after winning the election on or about January 2020, Bisono reported via letter to Crosby, that I was allegedly creating a hostile work environment in the facility for the Caucasian employees because I, Plaintiff was a reverse racist.

40. One of the examples, that Bisono points to, in his letter that I was creating an environment of reverse racism was that *"Rebecca Wilkin could not eat crackers but an African American could have a full course meal in the same area."*

---

[2] https://www.pewresearch.org/short-reads/2020/05/14/the-state-of-the-u-s-postal-service-in-8-charts/

41. Rebecca Wilkin is a Tour 3 (evening shift) Mail Handler in the Providence RI P&DC. She is a Caucasian woman.

42. Bisono takes the curious position that to be against anti-Black racism, is somehow the same as being a racist. I have never hidden the fact that I am opposed to racism. Bisono, however, paradoxically has twisted my ideology of treating all mankind with humanity, to suggest that I actually hate Caucasians. He is wrong in that. And he has absolutely no evidence that I have ever deprived a Caucasian of their humanity, which is the crux of what it means to be a racist.

43. Bisono alleges that *"As soon as I announced to the floor that I was running for President, the issues began. Jenifer G DeAndrade put a big target on me"*, without elaborating on how that targeting was manifested. Bisono and I worked different shifts. I'm not sure what he means by target, except that I <u>did</u> make sure he was not getting paid for hours into my Tour 1 (overnight) shift if he wasn't actually in fact working them.

44. In January 2020, while I was away on official travel to the Albany NY mail processing facility for a cross-facility training experience, Crosby would send me an email informing me that I was being temporarily demoted to an attendance control role, and that SDO David A. Pontarelli, a Caucasian male, was being temporarily promoted to fill my position, because he (said at the time) wanted to give others the opportunity to learn my job.

45. I would learn later during my temporary demotion to attendance control, that I was also being investigated over the reverse racism allegations raised by Bisono. I was not given a copy of Bisono's letter at the time, but Crosby verbally hinted to it in our discussions, saying that there was an allegation that I was allegedly harassing the Caucasian employees.

46. Crosby would not just demote me, but he would demote _all_ of the Black women who had worked in management in the facility in 2019. There had only been 3 of us: myself, Acting SDO Moriamo Balogun, and Acting SDO Jasmine Semper.

47. I immediately raised my concerns over the explicit sexism and racism that we were facing, Balogun, Semper and I, through EEO, MSPB and an internal appeal process with Headquarters. Bisono's allegations were false, defamatory and unsubstantiated. But yet Crosby saw no issues with the way he had in-turn targeted us (I, Balogun and Semper) because of our gender, race and color.

48. Presumably because we were Black women, to Crosby, that made us instantly guilty of reverse racism and provided cause to then humiliate us, by showing all of the employees within the facility that he could mistreat us. He sent a loud message that he didn't consider us as a true part of the management team and made his decision with ever having produced any evidence to which we might be able to defend ourselves and our characters. As Black women we had no value and could be replaced not based on facts or evidence, but instead on false rumor and suspicion.

49. In all of my two decades working for the USPS, I have seen many accusations of racism. However, I, Balogun and Semper were the first that I have ever seen demoted in order for an investigation to be conducted.

50. In my particular case, the demotion was especially humiliating. There was no reason why Crosby could not have reassigned me at least to a position of the same level.

51. The USPS has a "temporary reassignments" Memo that is instructive. It advises that discussions should take place beforehand and that reassignments should not be punitive. Apparently, Crosby has never read it. Or maybe he did, but decided to be non-compliant anyways.

52. In my over 40 years on this planet, I have never been formally accused of being a reverse racist by anyone except Michael A. Bisono, Local President of the NPMHU Local 301, Branch 18. The allegations are not only false, but they are painful and defamatory. My reputation and career have been smeared without any meaningful opportunity to defend myself. I am a Black woman living in a Caucasian world. Yet, according to Bisono, it is my ilk that is oppressing the majority because I wouldn't allow Mail Handler Rebecca Wilkin to eat crackers on the workroom floor while she was supposed to be working on overtime.

53. The mistreatment of Black workers at the USPS has a long history that continues to this day. Author and Historian Philip F. Rubio provides an extensive documentary of the painful struggles in his 2010 published book titled *There's Always Work at The Post Office – African American Postal Workers and the Fight for Jobs, Justice and Equality.*

54. The Postal leadership in the Boston District was even once found as recently as 1992, to be engaging in systemic disproportionate dismissals of Blacks[3]. It is my knowledge and belief that the racism evolved to at least allow Blacks employment at the USPS. However, climbing the ranks is now what is prohibited for us. For Black women, there is what is called, a cement ceiling that we hit.

55. Currently there are no employees of color leading any functions within the USPS MA-RI District. This evidence speaks for itself, and it is not by accident.

---

[3] See Zwerling, C., & Silver, H. (1992). Race and Job Dismissals in a Federal Bureaucracy. *American Sociological Review, 57*(5), 651–660. https://doi.org/10.2307/2095918

56. On or about January 20th, 2020, Crosby would contact the District Human Resources Department to initiate an investigation. He would tell me, Plaintiff, that he had no idea who had called for the investigation. The documentation proves that he lied to me.

57. The investigation into the reverse racism allegations was conducted by Bates and Dragon, Defendants 8 and 9 from February 12th, through March 12th, 2020.

58. Crosby, urged Bisono to get his members to come forward with as many incriminating statements as possible that would prove the allegations. The investigation was coordinated with the NPMHU Local 301, Branch 18.

59. On March 6th, 2020, Crosby and I would meet to try and resolve my complaints. We entered into a global settlement where he promised to return me to my position by May 2nd, 2020. He told me around this time that the investigation hadn't uncovered any evidence that I had engaged in any misconduct and that there were mostly trivial matters, like my not allowing employees to wear headsets, hoodies and such.

60. A copy of the investigative report issued by Bates and Dragon, were forwarded to the Human Resources Manager on March 23rd, 2020. The coversheet of the report states: "*The enclosed report is for your review to determine whether or not the allegation(s) is/are supported by the information gathered, so that prompt and appropriate action will be taken in this matter.*"

61. The actual report starts off by saying "*Conclusion of Jennifer (sic) DeAndrade. It is alluded that Jennifer DeAndrade was given her position of MDO at the Providence P&DC due to an EEO settlement in our interviews. Whether this happened or not, Ms. DeAndrade is the MDO of record.*"

62. Bates and Dragon, when they interviewed me, never once asked me about how I had obtained the MDO position. Their "conclusion" that I was rumored to have gotten the position through an EEO

settlement was shocking, discriminatory and quite frankly illegal. That they offer up that specific "conclusion" as the basis for review and possible action is mind-blowing (because it suggests punishment for EEO activity). It appeared that they had taken Bisono's statement as gospel in their investigation.

63. To me, I believe that this flaw by Bates and Dargon, undercuts everything else that they go on to say in the report.  It shows that they don't know the difference between opinion and fact. They can not and should not be relied upon as objective truth-seekers.

64. It is documented that Bates and Dragon did ask SDO Salli Henderson, a Caucasian woman of Hispanic descent, *"Do you know if Jen filed EEOs to get her current position?"* They also asked her, *"Do you know if she has any family stresses?"*

65. Did Bates and Dragon, believe that as a Black woman somehow that I could never earn an MDO position through merit? Why then were they compelled to include such a deplorable RUMOR in an INVESTIGATION SUMMARY REPORT?!! And what exactly does my "family" have to do with anything? What right did they have to ask a COWORKER about my personal home family life?

66. There were about 2 dozen witness statements obtained through Bates and Dragon's investigation. In the interests of concision, I won't repeat them all. But I will highlight a few more.

67. One statement was from SDO Daniel J. Griffin, a Caucasian male who stated that I, Plaintiff *"stomp my feet"*.

68. One statement from SDO David A. Pontarelli, a Caucasian male stated that I, Plaintiff am *"very condescending and with her years of experience her attitude was it's her way or the highway."*

69. One statement from Patrick O'Rourke a Caucasian male Mail Handler who previously held the position of NPMHU Local 301 Branch 18 President, warns *"If something is not done to alleviate Ms*

*DeAndre (sic) from the position she so blatantly does not deserve than I will be forced to utilize the*

*avenues I have listed above."* Those avenues were complaints to OSHA, the National Labor

Relations Board, etc.

70. One statement from Joe Higgins, a Black male Mail Handler says: *"I got a PDI for attendance. I was*

*taking time off and came to work and there was Jenn. You can ask everyone, she passes our area*

*50-60 times."*

71. One statement from Lori Teper, a Caucasian female Mail Handler stated *"I was unable to perform*

*my Level 5 duties the way they should have been done because I clearly, was not the right skin color*

*to belong to the 'girl's club or obviously to make decisions on my own'."*

72.  What the entire investigative episode did uncover, was that I was an exceptional MDO who met all

performance indicators and requirements. I was reducing operational costs, keeping my reports

safe and engaging with the vast majority of the employees. That roughly 10% of them viewed my

efforts in a bad light, based upon their own opinions, anxieties and feelings, did not rise to any

misconduct or reverse racism on my part.

73. On May 2nd, 2023 I returned to my position as Tour 1 MDO, per the settlement agreement between

Crosby and I.

74. I performed my duties with the utmost care, diligence and professionalism until May 13th, 2020.

75. On May 13th, 2020 at approximately 9am or so after my shift was supposed to be over, I was

questioned by Crosby about a discussion that occurred between American Postal Worker Union

(APWU) Steward Michelle Morris, a Caucasian woman, and I on April 28th, 2020. Crosby, told me

that he was emergency suspending me for threatening Steward Morris with violence. I stated to

him that I had only threatened her with discipline, not violence. He also stated that he would need

to review Bates and Dragon's investigative report. He took my keys away and walked me to my car, while Joe Alves, NPMHU Steward watched with a smug look on his face.

76. The impetus for my emergency suspension was a grievance filed by James O'Brien, a clerk and APWU Steward, Defendant 11, on behalf of Morris where it seeks as remedy in the case *"Remove Jen DeAndrade from position of Tour 1 MDO and any other management position within the USPS that puts her in position to use her authority to bully, threaten and intimidate employees."*

77. O'Brien oversteps his authority in demanding something that neither he, nor Crosby have the right to do unilaterally and without due process safeguards. And he knows this as a long serving Steward. He also knows that he alone is not judge, jury and executioner.

78. The US Inspection was also contacted in relation to Morris's claims of having been threatened with violence by me. However, the US Inspection Service, Inspectors Sean M Boyce and Courtney Littlejohn did not feel that the allegations rose to the level of an Inspection Service Investigation and declined the request on May 6th, 2020.

79. In my over 40 years on this planet, I have never been accused of being violent. Never. No one will ever discover correlates of violence in any of my records.

80. Besides, as a Manager, why would I need to physically threaten anyone? It makes absolutely no sense. The biggest proverbial sword that I already had in my tool box, was the only that could sever someone's work relationship to the organization. Discipline is what makes more sense, not violence.

81. It is my belief that Crosby acquiesced to the unions' demands to Remove me from my position in an act of scapegoating, despite the fact that that is not the Unions' purview, and to abide by such

would violate my constitutional due process rights. In his mind, he thought that he could use the Postal Service's Zero Tolerance policies as basis.

82. By scapegoating and sacrificing me, Crosby gained favor with the unions and used it more than likely to support his "engagement" points. Who cares about another Black woman and her career that she's worked hard to achieve? His own career and advancement was more important.

83. There were other corrupt bargains going on at this time that I was questioning. For example, Crosby was using Covid pandemic leave to grant "free vacations" to certain employees, without respect to their Covid status.

84. Another corruption by Crosby was his manner of granting bonus checks. I had questioned him on it in November 2019 by email when I discovered it, and expressed my discontent that he went around on a whim passing out $500 bonuses to my in-direct reports without him having gone through a vetting process. I thought that it was a wasteful practice and unwise.

85. The Merit Systems Protection Board ("MSPB") has recognized that "scapegoating" happens in unjustly removing federal employees from their positions. This exact circumstance is mentioned on page iii of the May 2015 Report to the President and Congress, titled *What is Due Process in Federal Civil Service Employment?* The report is instructive on what it takes to remove a federal employee from their position, with a clear history and explanation of what due process should look like.

86. On May 14th, 2020 I would receive Crosby's official written notice placing me on suspension. It stated: "*This is to confirm that you were placed in a non-duty status with pay effective May 13th, 2020. You are advised not to return to duty until further notice. You will remain in this status until the completion of an investigation and decision on whether corrective action will issue. This action is taken due to your conduct while in your position as Manager, Distribution Operations at the*

*Providence RI P&DC. You are neither to return to duty nor enter any nonpublic workspace unless specifically notified or authorized by me. You have a right to appeal this action in accordance with ELM 652.4 within 10 calendar days."*

87. I once again, filed a new EEO complaint on or about May 13th, 2020 suspecting that my May 13th, 2020 suspension was a form of reprisal. I believe that Crosby thought in his mind that he finally had what was needed to do me in; an allegation that I had threatened someone with violence. So, he pounced on it.

88. On Monday, May 18th, 2020, Crosby would send a district wide email which said:

   *"Good Afternoon, Troy Scott will be responsible for Distribution operations on Tour 1 effective immediately and until further notice at the providence P&DC. I am looking forward to having Troy back on the team in Providence. Troy and I will be meeting to discuss future goals and expectations."*

89. The email when it was shared with me, confirmed my suspicions that Crosby had no intentions of returning me to my position. Him and Troy Scott, a Black male would be meeting to discuss *future* goals? In my position?

90. Internal emails that were later released to me through the discovery phase of the EEO complaint, show that Connie Marvin, District Manager of Labor Relations, Defendant 5 had forwarded to Crosby, the emergency suspension notice that he issued to me. The internal emails also show that Crosby was in communications with Michael R. Salvon, USPS Attorney, about my case since May 2020.

91. The first week of June 2020, I agreed to mediate my newest EEO complaint with Crosby and Salvon, as his representative. Problem is, when the mediation happened by zoom, Crosby and Salvon

stated that they had nothing to share. The investigation was ongoing they said. No resolution was possible.

92. In accordance with the instructions written in the emergency suspension letter, I would end up writing four internal appeal letters for my suspension. None of them would be responded to in writing.

93. I did get invited to meet in person with the Step B official Duane Lariviere, then Boston General Mail Facility (GMF) Plant Manager, who was Crosby's higher level. Lariviere, self identifies as a Caucasian male of Hispanic origin. Our meeting happened on July 27th, 2020. During the meeting, Marvin sat in, quietly listening to all I had to say. Lariviere claimed innocence. He said he had no idea what was going on, and that he would follow-up to make sure that an investigation was completed swiftly.

94. After telling Lariviere how I suspected the corrupt bargain between Crosby and the union(s), Lariviere told me very clearly that the "*Union doesn't tell me who can and can't be in management in my facility.*"

95. Lariviere's claims of not knowing anything about my case, I know now to be false. Through discovery, it was revealed that Crosby notified him by email the same day that he had suspended me:

| From: | Crosby, Lawrence Buddy W - Providence, RI |
|---|---|
| To: | Bruso, Theresa T - Windsor, CT |
| Cc: | Lariviere, Duane - Boston, MA |
| Subject: | heads up |
| Date: | Wednesday, May 13, 2020 9:44:21 AM |
| Attachments: | XBIT 2.pdf |
| | Jen Questions.pdf |

I placed Jen DeAndrade on Emergency placement today. I would expect multiple emails or letters to be flowing in to the Area or even Headquarters. I am working with HR and Labor just wanted to give you a heads up. I am also investigating a pub 552 that was completed by CCTV that is over one thousand pages and accusations of time tampering. The above she told an employee to watch her back.

Thank you
Buddy

96. Also, since at least July 7th, 2020, Crosby was in email communications with him, St. Germaine,

Marvin and Attorney Salvon, requesting to meet about it:

>>>
>>> -----Original Message-----
>>> From: Crosby, Lawrence Buddy W - Providence, RI
>>> Sent: Tuesday, July 7, 2020 11:16 PM
>>> To: Marvin, Connie M - Boston, MA <connie.m.marvin@usps.gov>; Foley, Michael J - Boston, MA
<michael.j.foley@usps.gov>; Salvon, Michael R - Windsor, CT <Michael.R.Salvon@usps.gov>; Lariviere, Duane -
Boston, MA <duane.lariviere@usps.gov>; Stgermaine, Martha A - Providence, RI
<martha.a.stgermaine@usps.gov>
>>> Subject: Meeting
>>>
>>> What is a good time to set up a meeting regarding MDO DeAndrade?
>>>
>>> I would like to get the new PM up to speed and get an interview scheduled with her VIA zoom.

can also
make my self available in person any day next week if necessary.
>>>
>>>
>>>
>>> Thank you
>>>
>>> Buddy

97. My final Step B appeal letter was a follow-up to that July 27th, 2020 meeting. I wrote to Lariviere again on September 7th, 2020 reminding him of the promises he made to me that he would look into my case. Lariviere would state in an affidavit dated December 2nd, 2020 that he left the matter up to Crosby and Marvin. He did not respond to my appeal without any explanation as to why he was abdicating his duty.

98. Despite this admission by Lariviere, in a May 28th, 2021 discovery admissions document, Attorney Salvon would deny that I was not given a Step A and/or Step B appeal.

99. I never heard back from Lariviere and at some point, learned that he had retired and that Crosby succeeded him as the new Boston Plant Manager, while St Germaine succeeded Crosby in Providence.

100. After I had left my in-person meeting with Lariviere in Boston on July 27th, 2020, I traveled to Providence where I met with Crosby on the same day for an "Investigative Interview". During the Interview Crosby asked questions that proved to me that he had no evidence of wrongdoing on my part.

101. He even asked me to expand on my sexual and romantic life since I "was a married woman a decade ago". That, I told him that I would never share with him. This was especially hypocritical for a man who was actively in an inappropriate relationship with his own subordinate, Providence SDO Jillian Lombardi. If he wanted to investigate inappropriate workplace relationships, he should start with the ones that were happening right under his own nose, starting with him first.

102. Why was my personal private life under such scrutiny? Why am I the only one being punished based on suspicions?

103.     In all my decades working at the USPS, I know that the witch-hunt imposed on women like me, was just part and parcel of what I had to go through. Another high-ranking woman had just succumbed to the pressure. I didn't know her. But the rumor mill was clear that she had been "caught" having a relationship with some direct or indirect report. Fearing the humiliation of the treatment the patriarchal leadership would impose on her, she resigned and didn't stand her ground.

104.     I had been given a heads up by a friend that Crosby had expanded his investigation to looking at clockrings. So, I was ready for him with a good answer when he asked me about my alleged practice of "manipulating clockrings". I told him all about how in my previous position as a Dispute Resolution Specialist, I had authored decisions on proper clockring activities. He could go find the decision I authored for the New Bedford MA post office installation if he wanted to learn more about where I stood on clockrings.

105.     Outraged, but at the same time feeling better about the lack of evidence had by Crosby, I went home after the Investigative Interview to wait for his decision.

106.     In December 2020 Crosby sent me a 20-year service certificate in the mail, thanking me for my years of service.

107.     In May 2021 as my EEO complaint had reached the EEOC hearing stage, Attorney Salvon offered me, through my attorney at the time, an opportunity to get back to work. The offer demanded that I sign a global EEO settlement dropping all claims. In exchange, I could go back to work, but having given up my position, level and pay.

108.     My response was *"Absolutely not. I haven't done anything wrong. Do what you have to do with the findings of the investigation. Let me know what was found."*

109.     I would wait again for more word. It wasn't until more than a year later in July 2022, that I was invited to a meeting with St Germaine and Salvon on July 19th, 2022. By 2022, St Germaine was the permanent Plant Manager at the Providence P&DC.

110.     Again, they, St Germaine and Salvon offered me the opportunity to get back to work, but it was only if I dropped all of my EEO complaints and gave up my MDO position. She offered me what she thought was desirable to me, which was the vacant Level 20 Operations Support Specialist (OSS) position. St. Germaine told me that she though I was smart, capable and had a great analytical mind. She said that I was best suited for a "support" position and not leadership. I told her that her suggestion and offer was both sexist and racist. In her mind, as a Black woman apparently, she only sees my potential in "supporting" others to lead, and not being capable of it myself.

111.     My response again was "*Absolutely not. I haven't done anything wrong*. I'm not interested in the support role you envision for my career"

112.     During the meeting St Germaine told me that I couldn't lead anyone. I asked her why. She couldn't give me a straight answer except to dubiously say something about "the investigation".

113.     While I was waiting for the final determination to be made in my case over the years, I filed new EEO cases periodically to protest the protracted suspension. I filed one against Marvin and St Germaine seeing as how the investigation had presumably shifted to them.

114.     Due to the ongoing nature of the harassment and retaliation that I have faced, those issues will more than likely be absorbed and addressed by this civil complaint. A few of my complaints were dismissed for being similar or related to my May 2020 complaint.

115.     I also applied for any job that I felt I was qualified and that was desirable to me.

116.    I applied to the EAS Level 23 Manager, In-Plant Support (MIPS) position in Providence twice. Both times St Germaine disqualified me as "unsuitable". The first time it was posted from October 19th to November 3rd, 2021. She chose no one. The second time it was posted from March 29th, to April 13th, 2022.

117.    After St Germaine begged John Rinn, the Caucasian male, Tour 3 (evenings) MDO to take the MIPS position, with an offer he "couldn't refuse" he's stated, it created a vacancy for a Tour 3 MDO, Rinn's old job.

118.    I applied to that Tour 3 MDO job and again was deemed "unsuitable", despite my already being an MDO in the facility.

119.    At some point in early 2022, a decision was made to add a 4th MDO position to the facility. That extra allowance saw St Germaine reclassify my position as a higher level 22 job. However, she didn't promote me non-competitively as the postal rules demand. Section 353.4b of the postal Employee and Labor Relations Manual (ELM) states: *The incumbent is promoted noncompetitively if the position is upgraded with no significant change in duties or responsibilities.* The position had been posted for application from February 1st, 2022 to February 16th, 2022, to which I applied.

120.    Instead of following the postal rules and regulations, St Germaine alternatively promoted Jeffrey Jenkins, a Caucasian male into my job, who she had asked to come and cover my Tour 1 MDO position while I was on suspension (after Troy Scott returned to his own job).

121.    On January 17th, 2023 I received a letter in the mail from Marvin, Defendant 6. The letter purports to be some kind of objective investigative report summary. However, it is nothing more than Marvin's continued pattern of harassment, bullying and intimidation towards me. I have repeatedly called Marvin out for her discriminatory behavior towards myself and other Blacks in

prior EEO activity. Her most recent letter is an abuse of her position in a weaponization of the investigative process. Her report is full of lies and one-sided conclusory statements that lack specificity and facts. For example, she accuses me of falsifying an investigation. Falsifying an investigation?!! How did she come to that conclusion without ever having INTERVIEWED ME?!! Did she not think that I might be able to present exculpatory evidence? Because I can. I have it. So, how can her report be objective in accordance with the policies and procedures related to investigations in Publication 552? It can't.

122.    And, what took her so long to simply review the prior botched and flawed discriminatory investigation that she is now trying to sanitize and coverup?  The delay in my opinion is her clever attempt to try and gloss over the details. She doesn't want for anyone to dig into the weeds of what she is putting out there to try and ruin my career and my reputation. She is also trying to provide cover for the criminal acts committed by Crosby in colluding with the unions to remove me from my position.

123.    On January 30th, 2023 I was finally allowed to resume working. I suspect it was after I had filed a class action EEO complaint where I had disclosed to the EEOC Administrative Judge assigned, that the USPS had kept me out of work without cause for almost 3 years. And that they were doing it as a systemic practice to keep Blacks from advancing within the organization.  I believe that that was what triggered some action in my case.

124.    Upon my return to duty, St Germaine removed me from my MDO position (as it still reflected on my most recent Form 50) and unilaterally and involuntarily assigned me to the vacant EAS level 20 OSS job that I had refused on July 19th, 2022.

125.    St. Germaine wrote in the letter that she sent me, instructing me to come back to work, that the directed reassignment was for "the needs of the Service."

126.    I was instructed to report to MIPS Rinn on my first day back. I wouldn't see Rinn for about 2 weeks, as somehow St Germaine forgot that Rinn would be on vacation.

127.    I have filed an appeal with the MSPB on this directed reassignment that I contend qualifies as a constructive reduction in grade, due to my old job being re-classified as a Level 22 position. The MSPB appeal is docket no. PH-3443-23-0151-I-1 and it is currently pending a decision on jurisdiction.

128.    On January 30th, 2023 when I returned to work, St. Germaine would hand me a Proposal for a Letter of Warning in lieu of a 14 Day Suspension. In it, St. Germaine claims that it is the result of the investigation. However, the proposal notice fails to address why the investigation took almost 3 years and what was the most recent information that had been obtained. Most of the specifications, which lacked specificity, covered a timeframe that went back to 2019 making it untimely and prejudicial to my ability to raise defenses.

129.    St Germaine had never interviewed me prior to making her disciplinary proposal, despite the fact that it contained new information that had never been shared with me in a way that I might be able to respond. For example, she cites a statement from Mail Handler Aubrey Dante, a Caucasian male Mail Handler alleging that I violated the Communication Accommodation Plan (CAP) for Mail Handler Chris "Marion" Elder, another Caucasian male. Allegedly, according to Dante, I told him Dante, while working as an acting SDO on Tour 1, to violate Elder's CAP. The problem is that Dante only worked for me as an Acting SDO through April 2019. Elder's CAP was entered into in May 2019. So, Dante's story doesn't add up. But yet, St Germaine has cited it as a reason to support her

charge that I had failed to perform my duties satisfactorily. Why was she not interested in what I had to say about it? Why was Dante more credible than I, despite the fact that his dates don't corroborate his version of events?

130.    St Germaine also alleges that so many employees have a negative opinion of me. That is specification number 1 in the notice. I am lost as to how to address other people's opinions of me. I had no idea that MDOs were subject to a likability contest.

131.    But notwithstanding, what was the overall total view of me in Providence? What did *all* of the employees have to say, and not just those trying to gain favor with the leadership that has demonstrated a desire to get rid of me (who many of them have been in-turn promoted, I might add). Objectively, what is the opinion had, of Jenifer DeAndrade? Had St Germaine taken that more objective approach, and gotten evidence, and shown me that everyone is treated to the same standard, then maybe I might accept her allegation as truth.

132.    Another critical, and harmful error committed by St Germaine in the disciplinary notice she handed me on January 30th, 2023 is that she fails to demonstrate a nexus to postal efficiency. She fails to advise me of what rules and/or regulations I have broken. This is a flaw that is prejudicial to me, as I have no way of defending myself against allegations that I have violated a rule, if I am not put on notice of what that rule might be.

133.    Almost 3 years of my career has been stolen from me, and they won't tell me what rule I have broken. What an injustice!

134.    In my appeal of the notice or proposal to St Germaine's higher level, Christine E. Brisk, a Caucasian woman, Senior Director of the New England Division Processing Operations, I tried to bring attention to the numerous issues with the proposal for suspension.

135.    To date, that proposal is still hanging over my head. Brisk has not made a decision yet, 7

months later. She has told me in writing that she needs to conduct her own investigation into the

issues that I brought up.

136.    Brisk, conducting her own investigation might constitute ex-parte information for her, which

would be again, prejudicial to me.

137.    3 years of my career has been taken away, in addition to my position and all future

opportunities. And I have yet to learn the factual basis that supports it. Is this what the US Supreme

Court would agree due process and equal protections for a federal employee looks like? I hardly

think so.

138.    In 2016, even a divided Congress agreed in the Administrative Leave Act that investigative

suspensions for federal workers in most cases should take 100 days or less. In my case, I was on

Administrative Leave for 991 days.

139.    Upon return to duty on January 30th, 2023, Bisono posted the following notice up on the

bulletin board outside of the cafeteria at the same time that St. Germaine urged me to go and work

with Mail Handlers in the facility in updating Standard Work Instructions. The situation feels like

entrapment:



140.  I'm curious to know why the NPMHU feels entitled to my employment and personnel

information.

141.  Bisono considers the expiration of an almost 3 year long absence to be an abrupt return? And

then somehow he feels entitled to be consulted first. How does my privacy fit into all this?

142.    And, what does Marvin have to say about all this? What responsibility does she and all the other Defendants have in creating this situation? Everyone wants to know.

143.    Could it be that Crosby and what he has done in entering in a corrupt bargain with the Unions, is what instructs the NPMHU to continue abusing, harassing and defaming me in my career?

144.    I've had many employees call me to express sadness, anger and shock that the USPS is allowing the Union(s) to harass and defame me this way.

145.    I've filed a complaint over it, yet again through the EEO process, but it was dismissed. Management states that there is nothing they can do to stop the harassment.

146.    Recently O'Brien filed a grievance about me too, since I've been back to work. He asked as remedy for his case, that the USPS put up special gates and a buzzer around the box section to keep me out, as if I was a rabid animal.

147.    Why am I the only one who should be kept out of the box section exactly? What has been my crime? O'Brien doesn't want me helping to solve any of our customer's problems, although that is part of my current position. Apparently, that is my crime. Efficiency and Service.

148.    As of June 17th, 2023 my former Tour 1 MDO position is vacant, with Jenkins having been promoted to a MIPS position in Boston. Crosby promoted him.

149.    St Germaine refuses to allow me equal opportunity to get back into my old position, that would benefit my career and finances.

150.    St Germaine refuses to even discuss the opportunity, depriving me of any meaningful dialogue that might assuage my feelings of discrimination, harassment and retaliation, or give me something constructive to work towards correcting.

151.    I have lost so much, for having taken away absolutely nothing from anyone else. For all of the allegations and conclusory statements, nothing has been properly presented to me. Nothing has been proven in front of an independent authority. I have a clean disciplinary record (a proposal for discipline isn't considered discipline until it gets decided). Everything is top secret as if the USPS functions in star chambers.

152.    I thought that I lived in America. And that I was an American citizen.

153.    My only crime, is the pursuit of efficiency for the Service.

154.    Many of the employees that have been cited as not liking me, aren't even around anymore, or are at least not on Tour 1. Now, why am I not able to move on or forward in my life and career? Why must I stay in a professional prison to be abused?

155.    It is with great sadness and trepidation in my mind, heart and soul that I must bring this matter forward, seeking help and protection under the United States Flag.

156.    I consider it to be an act of courage meant to try and fix all that is wrong with my beloved Agency, the United States Postal Service, and I hope that a jury agrees with me.

### VI.    CLAIMS AGAINST DEFENDANTS

**COUNT ONE**
**GENDER, RACE AND COLOR DISCRIMINATION,**
**HOSTILE WORK ENVIRONMENT**
**IN VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964,**
**42 U.S. CODE § 2000E-2.**
**(AGAINST USPS)**

157.    I, Plaintiff repeat and re-allege each and every allegation contained in the proceeding paragraphs as if stated fully herein.

158.    Defendant 1, USPS discriminated against me with respect to term, conditions, and/or privileges of employment based on my gender, race, and color as outlined above. Additionally, USPS created and maintains a hostile work environment based on my gender, race and color.

159.    As a result of USPS's conduct, I have suffered damages, including but not limited to lost wages, damage to reputation, work opportunities, emotional distress, life enjoyment, costs, reasonable attorney's fees and interest.

WHEREFORE, I, Plaintiff Jenifer Gomes DeAndrade demands judgement against Defendant USPS, in an amount to be determined at trial, plus interest, costs and attorneys' fees where applicable.

## COUNT TWO
## RETALIATION
## IN VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964,
## 42 U.S. CODE § 2000E-3.
## (AGAINST USPS)

160.    I, Plaintiff repeat and re-allege each and every allegation contained in the proceeding paragraphs as if stated fully herein.

161.    I, Plaintiff engaged in protected activity by complaining of discrimination at the USPS by various members.

162.    I, Plaintiff engaged in protected activity by complaining of retaliation by Crosby and St. Germaine to the USPS.

163.    I, Plaintiff engaged in protected activity by filing formal charges with the EEO claiming retaliation on August 1st, 2020.

164.    I, Plaintiff also engaged in protect activity by filing the present lawsuit.

165.    Defendant 1, USPS retaliated against me for engaging in protected activity as outlined above.

166.     As a result of USPS's retaliation, I have suffered damages, including but not limited to lost wages, damage to reputation, work opportunities, emotional distress, life enjoyment, costs, reasonable attorney's fees and interest.

**WHEREFORE**, I, Plaintiff Jenifer Gomes DeAndrade demands judgement against Defendant USPS, in an amount to be determined at trial, plus interest, costs and attorneys' fees where applicable.

## COUNT THREE
## VIOLATION OF THE PRIVACY ACT OF 1974
## 5 U.S.C. § 552E
## (AGAINST USPS, NPMHU, AND BISONO)

167.     I, Plaintiff repeat and re-allege each and every allegation contained in the proceeding paragraphs as if stated fully herein.

168.     Defendant 1, USPS violated my rights to privacy when its members engaged third parties, in discussions, investigations, inquiries, consultations and decision making about my career, personnel file and personal life without my presence or consent.

169.     Defendants 2 and 10, NPMHU and Bisono violated my privacy rights when they engaged in discovering and published on a bulletin board, my personnel information that they had obtained from USPS without my knowledge or consent.

170.     As a result of the USPS's conduct, I have suffered damages, including but not limited to lost wages, damage to reputation, work opportunities, emotional distress, life enjoyment, costs, reasonable attorney's fees and interest.

171.    As a result of the NPMHU's and Bisono's conduct, I have suffered damages, including but not

limited to lost wages, damage to reputation, work opportunities, emotional distress, life

enjoyment, costs, reasonable attorney's fees and interest.

WHEREFORE, I, Plaintiff Jenifer Gomes DeAndrade demands judgement against Defendants USPS,

NPMHU and Bisono in an amount to be determined at trial, plus interest, costs and attorneys' fees

where applicable.


## COUNT FOUR
## DUE PROCESS AND EQUAL PROTECTION
## IN VIOLATION OF THE <u>CIVIL RIGHTS ACT OF 1871</u>
## 42 U.S.C. §§§ 1983, 1985, 1986.
## (AGAINST ALL DEFENDANTS)

172.    I, Plaintiff repeat and re-allege each and every allegation contained in the proceeding

paragraphs as if stated fully herein.

173.    All Defendants have engaged in a widespread conspiracy to deprive me of my constitutional

rights to due process and equal protections under the law prior to being deprived of work

opportunity, my federal position, and future opportunities.

174.    All of the Defendants have been shown, through direct knowledge or reasonable beliefs, to

have been involved with a role, in the triggering May 13th, 2020 decision by Crosby to place me

under emergency suspension.  All of the Defendants made it possible for Crosby to take the actions

that he did.

175.    Further, all Defendants had an opportunity to retreat in their actions, or to step in and prevent

further harm to me, the Plaintiff as a check and balance. All have willfully chosen not to, and the

deprivations I have suffered, go on unabated.

176.    Most conspiracies and collusions can be dissipated with the actions of one party within the group. Here in this case, all parties remain bonded in collusion and intent to destroy me, Plaintiff in a humiliating manner that Blacks have been subject, for generations since Emancipation.

177.    As a result of the Defendants' conduct, I have suffered damages, including but not limited to lost wages, damage to reputation, work opportunities, emotional distress, life enjoyment, costs, reasonable attorney's fees and interest.

WHEREFORE, I, Plaintiff Jenifer Gomes DeAndrade demands judgement against Defendants in an amount to be determined at trial, plus interest, costs and attorneys' fees where applicable.

### COUNT FIVE
### DEFAMATION
### IN VIOLATION OF 18 U.S. CODE § 1038
### (AGAINST NPMHU AND BISONO)

178.    I, Plaintiff repeat and re-allege each and every allegation contained in the proceeding paragraphs as if stated fully herein.

179.    I, Plaintiff have been defamed repeatedly through written letters and published notice to all employees of the Providence P&DC by the NPMHU and their office holder, Bisono.

180.    It has been shown that the impetus to the very first act of punishment I have faced, the January 2020 demotion, was a direct result of Bisono in a letter to Crosby, attesting that I was creating a reverse racism environment for the employees under my charge. The letter even pretends to provide evidence of the assertion and to claim some strong credibility.

181.    However, the allegations were false and Bisono knows or should have known that his allegations were false.

182.    Bisono's actions in defaming me were taken with malicious intent to cause me harm.

183.    Some notices have been posted up in the NPMHU's offices.

184.    One particular notice, was posted up on the bulletin board outside the cafeteria within the Providence RI P&DC that is utilized by an approximate 1000 employees, contractors and visitors. See preceding paragraph 139.

185.    The postings about me, would lead any reasonable person to believe that I have been found by a fact finder to have engaged in threatening, intimidating or violating an employee. That, I have not.

186.    The postings in how they are phrased and also in how they specifically target me as a culprit demanding of alertness, give the impression that I am a danger to be avoided.

187.    The postings in how they are phrased and also in how they specifically target me as a culprit demanding of alertness, give the impression that I am a management person without any real authority.

188.    As a result of the NPMHU and Bisono's conduct, I have suffered damages, including but not limited to lost wages, damage to reputation, work opportunities, emotional distress, life enjoyment, costs, reasonable attorney's fees and interest.

   **WHEREFORE,** I, Plaintiff Jenifer Gomes DeAndrade demand judgement against NPMHU and Bisono in an amount to be determined at trial, plus interest, costs and attorneys' fees where applicable.

### VII.    <u>RELIEF REQUESTED</u>

   WHEREFORE, I Plaintiff request that this court enter judgement against Defendants:

1. For compensatory damages in an amount to be determined at trial;

2. For punitive damages in an amount to be determined at trial;

3. For reasonable attorney's fees, together with costs and disbursements, pursuant to 42

   U.S.C. § 1988 and the inherent powers of this Court;

4. For pre-judgement interest as allowed by law; and

5. For such other relief as this Court may deem just and proper.

**I, Plaintiff demand a jury trial in all claims so triable.**

By signing below, I certify to the best of my knowledge, information, and belief that this complaint: (1) is not being presented for an improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation; (2) is supported by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law; (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and (4) the complaint otherwise complies with the requirements of Rule 11 of Federal Rule of Civil Procedure.

**Dated: Boston, Massachusetts**
**Friday, August 25th, 2023**

Respectfully submitted:

*Jenifer Gomes DeAndrade*

Jenifer Gomes DeAndrade          8/25/2023
*Plaintiff,* PRO SE.
10 Fuller Ave Unit 3
Attleboro MA 02703
(508) 212-2444 cell
Jeniferdeandrade60@comcast.net